Blanc v Caridi (2024 NY Slip Op 51596(U))

[*1]

Blanc v Caridi

2024 NY Slip Op 51596(U)

Decided on November 20, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 20, 2024
Supreme Court, Kings County

Andieuvil Blanc and Marie Rene Blanc, Plaintiff,

against
John Caridi, M.D., MOUNT SINAI HOSPITAL, and JOHN DOE, M.D., 
 (identities currently unknown but known as anesthesiologist who provided medical treatment and care to plaintiff at the defendant hospital and/or health care facility), Defendants.

Index No. 515857/2020

Plaintiffs
Nealraj Bhushan, Esq. (nealraj@bhushan@gmail.com)
Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, Suite 3700
New York, NY 10016
212-869-3500
Defendants
Michele C. Greco, Esq. (mgreco@hpmb.com)
Heidell, Pittoni, Murphy & Bach, LLP
81 Main St.
White Plains, NY 10601
914-559-3131

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 37 — 40, 41 — 60, 61, 62 — 66, 67 — 68
Defendants John Caridi, M.D. ("Dr. Caridi") and Mount Sinai Hospital ("Mount Sinai") move (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them. Plaintiffs oppose the motion.
Plaintiffs Andieuvil Blanc ("Mr. Blanc" or "the patient") and Marie Rene Blanc [*2]commenced this action on August 26, 2020, asserting claims of medical malpractice, lack of informed consent, and negligent hiring and retention, in connection to two spinal surgeries performed on March 7, 2018 and April 11, 2018, as well as his pre-operative treatment and consultations. Mr. Blanc's wife also asserts derivative claims for loss of services.
At the start of the treatment in question, Mr. Blanc was 37 years old. He had a prior surgery on his back as a child, a long history of problems ambulating, and walked using crutches since 1990. On March 16, 2017, he underwent a thoracic spine MRI at Mount Sinai, which revealed abnormalities including S-shaped scoliosis (sideways curvature of the spine) and 120-degree kyphosis (forward curvature of the spine).
Mr. Blanc first presented to Dr. Caridi, a Mount Sinai Health System neurosurgeon, on August 30, 2017. Dr. Caridi gave him a surgical evaluation due to "significant difficulty ambulating," lower extremity weakness, and inability to bear weight on his right lower extremity. On strength examination, the patient was assessed with right-sided 4/5 iliopsoas strength, 3/5 quadriceps strength, and 0/5 anterior tibialis and extensor hallucis longus strength. On the left side he had 5/5 ilopsoas and quadriceps strength, and 4/5 anterior tibialis and extensor hallucis strength.
Dr. Caridi reviewed his thoracic spine MRI and assessed him as having a severe thoracic spinal deformity and compression of the spinal cord. He documented that he recommended surgery to "decompress, stabilize and correct his spinal deformity" and "discussed with him the risks, benefits, alternatives and expected outcomes of the surgery."
On September 12, Mr. Blanc saw another surgeon for a second opinion. He was assessed by non-party Martin Quirno, M.D. ("Dr. Quirno"), who obtained additional CT scans of the thoracic, lumbosacral, and cervical spine. Dr. Quirno also presented his case to a group of surgeons at the "high-risk spinal conference" at NYU. On October 17, Dr. Quirno noted that there was a consensus among the high-risk spinal surgeons that the patient "does require a vertebral column resection probably at T6 and T7 to realign the thoracic spine and correct the deformity and protect the spinal cord and decompress it." He also stated that a T2 to pelvis fusion was "probably required." He documented that the patient was still unsure about having the surgery. He referred the patient to meet with non-party Peter Passias, M.D. ("Dr. Passias") at the New York Spine Institute, a surgeon experienced with similar procedures, whom Dr. Quirno intended to assist him in the surgery.
On November 2, Dr. Passias documented having a detailed discussion about the risks and benefits of a complex spinal surgery with the patient. They also discussed the likelihood that blood transfusion would be necessary, which the patient would not consent to as a Jehovah's Witness. Dr. Passias then referred the patient back to Dr. Quirno to "move forward with surgical planning."
On November 14, the patient had a follow-up appointment with Dr. Quirno. After discussing Mr. Blanc's religious objections to blood transfusion, Dr. Quirno concluded that he would not proceed with the patient's surgery due to the "very high likelihood of blood transfusion and blood loss," and noted that the patient would "attempt to follow up with another surgeon."
On December 14, Mr. Blanc returned to Dr. Caridi, who noted that his lower extremity symptoms were worsening and that he had "increasing difficulty with bowel and bladder function." Dr. Caridi documented that he discussed the benefits of "a procedure to decompress the spinal cord from T6-T8 and realign the spine via a posterior fusion from T2 through L3 and a [*3]vertebrectomy at T6 and T7." He told him that he could perform this surgery in two stages to minimize blood loss and avoid the need for a blood transfusion.
On March 1, 2018, Dr. Caridi had a final pre-operative examination and consultation with the patient. Dr. Caridi documented that his bilateral iliopsoas and quadriceps strength had decreased to 3/5, and bilateral anterior tibialis and extensor hallucis longus strength was 2/5. He again documented discussing "the risks, benefits, alternatives, and expected outcomes," and the patient agreed to "move forward with surgery." Prior to each stage of the surgery, the patient signed a Mount Sinai consent form, along with a supplemental consent form stating that he agreed to receive limited blood products (albumin and cell-saver) but not blood transfusion.
Dr. Caridi performed the first stage of the surgery on March 7, 2018, from 11:48 a.m. to 4:30 p.m. at Mount Sinai, which consisted of a posterior spinal fusion and segmental instrumentation in each segment from T1 through L1. He performed the second stage of the surgery on April 12, 2018, from 1:58 p.m. to 7:46 p.m. at Mount Sinai, which included laminectomies, transpedicular decompression of the spinal cord, kyphosis correction, and posterior spinal fusion at T1 through L1.
At a follow up on May 24, 2018, the patient reported to Dr. Caridi that he had pressure and swelling in his back, mild pain in his left arm, and felt "he hasn't reached his baseline with his ambulation." Dr. Caridi advised him that these were typical recovery symptoms and prescribed gabapentin and physical therapy.
On July 5, 2018, Dr. Caridi saw the patient again, who reported he had pain in the parascapular (shoulder) region, spasms, and numbness and low strength in his bilateral lower extremities. These symptoms did not improve on his next follow-up appointment on July 26, at which time he also had right-sided numbness and cramping in his arm and hand. He underwent an MRI of the thoracic and lumbar spine on October 18, 2018, and Dr. Caridi's impression was that the spinal cord was "well decompressed." He saw Dr. Caridi again on January 31, 2019, reporting he had "decreased functional capacity compared to pre-op," and had at least two periods of urinary retention issues requiring a catheter after surgery. On January 31, 2019 and August 23, 2019, he reported continued difficulty walking and complaints of pain, spasms, and numbness.
Dr. Caridi last saw the patient on October 9, 2019, approximately 18 months after the second surgery. Mr. Blanc testified that since the surgeries, he could no longer walk outside his home with crutches and needed a wheelchair. Dr. Caridi's impression from his physical examination was that the patient's "neurologic status is largely unchanged" with 4/5 strength in bilaterial quadriceps and right-sided measurements, and 3/5 strength in left ilopsoas, anterior tibialis, and extensor hallucis longus. On review of his CT scans, Dr. Caridi documented there was "solid fusion across the thoracic spine . . . and no evidence of significant stenosis or cord compression." Dr. Caridi attributed to the patient's complaints to the recovery process and non-compliance with physical therapy to improve his strength.
Plaintiffs allege that Dr. Caridi departed from good and accepted medical practice by performing a high-risk and complex spinal surgery at the point in time that it was performed, which they further allege was a proximate cause of post-surgical complications and Mr. Blanc's decreased ability to perform activities of daily living. Additionally, Plaintiffs allege that Dr. Caridi did not adequately explain the risks, expected benefits, and alternatives to the surgery to Mr. Blanc when obtaining his consent to the procedure.
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the [*4]burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).
To sustain a separate cause of action for lack of informed consent, the injured party must demonstrate:
"(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury. The third element is construed to mean that the actual procedure performed for which there was no informed consent must have been a proximate cause of the injury" (Figueroa-Burgos v Bieniewicz, 135 AD3d 810, 811-812 [2d Dept 2016] [internal citations and quotation marks omitted]).
The Second Department further elaborated,
"[w]hile the signing of a generic consent form by the plaintiff does not establish that a defendant is entitled to summary judgment, a defendant can establish entitlement to summary judgment by demonstrating that the plaintiff signed a detailed consent form after being apprised of alternatives and foreseeable risks, by demonstrating that a reasonably prudent person in the plaintiff's position would not have declined to undergo the surgery, or by demonstrating that the actual procedure performed for which there was no informed consent was not a proximate cause of the injury" (Pirri-Logan v Pearl, 192 AD3d 1149 [2d Dept 2021] [internal citations omitted] [emphasis added]).
In support of this motion, Defendant submits an expert affirmation from Ron Riesenburger, M.D. ("Dr. Riesenburger"), a licensed physician certified in neurosurgery, as well as relevant medical records and deposition transcripts. Dr. Riesenburger sufficiently sets forth [*5]his qualifications to opine on the medical treatment at issue, as a certified neurosurgeon with experience and background in spinal surgery, including thoracic decompression and fusion for patients with kyphoscoliosis and other spinal deformities.
Dr. Riesenburger opines that Dr. Caridi did not depart from the standard of care in his treatment of Mr. Blanc, including the performance of the two-stage spinal surgery in 2018. Dr. Riesenburger opines that the surgeries recommended and performed by Dr. Caridi were "absolutely indicated" by the patient's symptoms and imaging studies. On review of the pre-surgery MRIs, Dr. Riesenburger notes that the patient had two significant deformities — markedly reversed S-shaped scoliosis and 120-degree kyphosis (20-40 degrees normal; over 50 degrees considered severe). The expert also agreed with Dr. Caridi's impression that his patient had compression of the spinal cord and partial dislocation of the spine at T5-T7. The expert notes that his symptoms included back pain, difficulty walking, lower extremity weakness, and bowel and bladder issues, as well as physical examinations showing "impaired strength and sensation in the lower extremities," and these findings worsened between his first visit with Dr. Caridi in August 2017 and his subsequent visits in December 2017 and March 2018. In the expert's opinion, these were indications that the patient was "experiencing a rapid progression of his neurological symptoms and the spinal cord was becoming further compressed." Further, the expert opines that his symptoms raised "concerns for a catastrophic event in the future," because untreated spinal cord compression can result in "irreversible neurologic deficits and nerve damage, including paralysis."
Defendants' expert opines that there was no conservative alternative to treating Mr. Blanc's condition, as physical therapy, pain medication, and/or bracing would not fix the underlying spinal deformities and spinal cord compression and would not halt the progression of his disability. The expert acknowledges that the surgery needed to correct Mr. Blanc's condition "would undoubtedly be massive and technically difficult," and that often such surgeries "cannot undo prior damage to the cord or the nerves." However, the expert opines that within the standard of care, a non -operative approach — essentially to observe and monitor the condition — would only be recommended if the patient had few or no symptoms, whereas Mr. Blanc had existing and worsening symptoms. He opines that Dr. Caridi appropriately weighed the surgical risks against the benefits of avoiding further progression, which would likely lead to complete paraplegia and loss of use of his legs. He also opines that the surgery was not contraindicated by the patient's objections to blood transfusion as a Jehovah's Witness. He opines that Dr. Caridi accounted for this in his two-stage surgical plan, which is acceptable neurosurgery practice, and notes that he avoided any injuries from blood loss.
Dr. Riesenburger opines in detail that both surgeries were properly performed in accordance with the standard of care, and the operative reports do not demonstrate any deviation from good and accepted practice in the techniques or hardware used. In Dr. Riesenburger's opinion, the outcome of the surgery was in fact successful, and the goal of decompressing Mr. Blanc's spinal cord was met. Upon review of Mr. Blanc's post-operative radiological films, he opines that there is good fusion, well-balanced correction, the spine is significantly straighter, and there is no longer evidence of significant stenosis.
On the issue of proximate causation of the patient's alleged injuries, Dr. Riesenburger opines that his subjective complaints of back pain, spasms, and difficulty ambulating are "part and parcel of the expected post-operative course," and further opines that it can take 2-3 years for muscle and soft tissue to "recover from the drastic change in the position" of the spine.
Finally, Dr. Riesenburger opines within the scope of his neurosurgery expertise that Dr. Caridi complied with the standard of care of a reasonable practitioner when he informed the patient of the risks, benefits, and alternatives to surgery. He notes that Dr. Caridi documented that these discussions were had with Mr. Blanc at three separate pre-operative consultations on August 30, 2017, December 14, 2017, and March 1, 2018. Dr. Caridi testified that he told Mr. Blanc about the potential risks of a complex spinal surgery (including the risk of paralysis, infection, blood loss, organ damage, and death) and that he could either have the surgery or watch the condition. Dr. Caridi further testified that he believed after their first August 30 discussion that Mr. Blanc would elect not to undergo the surgery, but the patient called him back for the December follow-up, and again he "went over the complications and the potential risks with him." Dr. Caridi testified that he also told the patient — correctly, in the opinion of the movants' expert — that without the surgery, he "would likely develop paralysis and become wheelchair bound." He testified that he did not give Mr. Blanc a time frame of how rapidly this paralysis would occur, but "he would progress eventually to becoming paralyzed," especially considering the fact his neurologic function worsened in the months between the three pre-operative visits. Dr. Riesenburger opines that Dr. Caridi appropriately explained that the benefit of the surgery was to avoid this eventual paralysis "and hopefully restore some lower extremity function." Eventually, the expert notes, Mr. Blanc chose to proceed and signed a detailed consent form prior to each surgery.
Based on the submissions, Defendants' expert has established prima facie entitlement to summary judgment on Plaintiffs' medical malpractice claims, setting forth an expert opinion that Dr. Caridi's decision to proceed with surgery, as well as the staging and performance of the surgeries, was in accordance with the standard of care. The expert also established that Mr. Blanc's alleged injuries were not proximately caused by any departure from the standard of care, opining that he exhibited the expected effects of complex spinal surgery, even if properly performed.
Defendants have also established based on the record, deposition testimony, and Dr. Riesenburger's expert opinion that Dr. Caridi disclosed the risks and complications to the spinal surgery in multiple conversations with the patient before he elected to undergo treatment and signed consent forms (see Matos v Schwartz, 104 AD3d 650, 652 [2d Dept 2013]; Johnson v Staten Island Medical Group, 82 AD3d 708 [2d Dept 2011]). Further, the expert opines that the actual performance of the surgery did not proximately cause or contribute to a worsening of the patient's condition, as supported by his own review of the record that "all the hardware was properly placed," the spinal deformities had been satisfactorily improved, the spine was "significantly straighter," and there was no radiological evidence the surgeries had caused his post-operative complaints. Therefore, Defendants have established prima facie entitlement to summary judgment on the informed consent cause of action, and the burden shifts to Plaintiffs to raise an issue of fact on both the medical malpractice and informed consent claims.
In opposition to the motion, Plaintiffs submit an expert affirmation from a licensed physician, [name of expert redacted], certified in neurological surgery. Plaintiffs also submit an affirmation from a licensed physician certified in radiology, [name of expert redacted].
The Court notes that Plaintiff has not complied with their requirement to present the Court with a signed, unredacted copy of these expert affirmations for in camera inspection (Richter v Menocal, 216 AD3d 823 [2d Dept 2023]). This defect was not cured after the Court reached out to Plaintiff's counsel by email, on notice to all parties, following oral argument. However, even if [*6]the Court accepted the submissions as duly "subscribed and affirmed" under CPLR 2106, the expert affirmations herein are insufficient to defeat this motion for summary judgment. "Although conflicting expert opinions may raise credibility issues which can only be resolved by a jury, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise a triable issue of fact" (Wagner v. Parker, 172 AD3d 954, 966 [2d Dept. 2019]).
In their redacted affirmation, Plaintiffs' neurosurgery expert states the required qualifications to opine on the subjects at issue, affirming that the expert is board-certified in neurological surgery and has performed surgeries in patients with spinal deformities. The expert does not dispute that Mr. Blanc had significant kyphosis and scoliosis deformities but opines that it was a departure from the standard of care for Dr. Caridi to recommend and perform "a very high risk, complicated" and even "impossible" spinal surgery, which in the expert's opinion was not urgent or necessary based on his symptoms.
The expert finds no fault or error in Dr. Caridi's performance of the surgeries, stating "I have no quarrel with the fact that the operation was performed in two stages or with the technique and instrumentation that was used" and that they "do not object to defendant's expert's opinion" on any aspects of the procedure as detailed in the operative report, i.e., the performance, staging, hardware, or techniques used in the surgery. Rather, the opinion of Plaintiffs' expert hinges on the fact that the procedure was performed at all, on the basis that the surgery itself was not warranted and that informed consent was not obtained.
The expert opines that the surgery should not have been undertaken in Mr. Blanc's case, and the standard of care required a more conservative monitoring approach — to "defer" surgical intervention until such time as the patient had clear decline of neurologic function. The expert states that Mr. Blanc had been "stable for many years and was able to walk effectively on crutches," and therefore he was not a proper candidate for the surgery. Based on the testimony of Mr. Blanc and his wife that he could drive a car, walk with crutches, and travel abroad, the expert opines that "it would be several years before he would require the operation."
The neurosurgery expert further opines that Dr. Caridi failed to properly inform Mr. Blanc of the risks and expected benefits of the surgery. Basing his opinion on the testimony of Mr. Blanc and his wife, the expert opines that Dr. Caridi did not give the patient appropriate expectations of the foreseeable risks and outcome, did not weigh the "pros and cons" with the patient, and did not tell him that he "might conceivably be many years away" from needing the surgery. The expert states "I believe that the standard of care called for frank informed consent discussion" which conveyed the procedure would be highly complicated, the primary purpose was to prevent his condition from deteriorating further, improvement of his current function (i.e., being able to walk without crutches) was possible but not likely, and there was a risk the operation could make his condition worse.
On the issue of proximate causation, the expert opines that the patient's post-operative complaints including leg weakness, urinary incontinence, and "other new or worsened neurological deficits" are most likely the result of a thoracic spinal cord stroke. The expert notes that such strokes, which can occur immediately or post-operatively, are a known complication or risk "even when there is no apparent surgical error" and can result from "a properly performed operation that involves altering the curvature of the thoracic spine." The expert also comments that based on their interpretation of the pre- and post-operative radiological films, there is a portion of the spinal cord "draped" over the kyphotic deformity, and focal widening of the spinal [*7]cord at T5-T7 which is "consistent with a focal injury of the spinal cord such as can be caused by a stroke." Again, the expert does not opine that the surgery was performed erroneously or with any deviations from the standard of care, simply that the fact it was performed at all or at the time it was undertaken was the proximate cause of this possible stroke and the resulting complications.
Turning to Plaintiffs' radiology expert, the Court notes again that Plaintiffs failed to provide an unredacted copy of their affirmation for in camera inspection as required (Richter v Menocal, 216 AD3d 823). Furthermore, "where a physician opines outside his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered" (Hannen v Nici, 218 NYS3d 127 [2d Dept 2024], quoting Abruzzi v Maller, 221 AD3d 753, 756 [2d Dept 2023]). Plaintiffs' redacted radiology expert established their background in reviewing and interpreting radiological studies for patients with spinal deformities and comparing pre- and post-operative neurological images, but they did not lay a proper foundation to opine on how the risks, benefits, and alternatives should be explained by a neurosurgeon prior to surgery. Therefore, even if their affirmation was properly unredacted, they may not render an opinion on the informed consent cause of action herein. The only opinion with possible probative value in their defective affirmation in their interpretation of the radiological films.
Plaintiffs' radiology expert opines, in relevant part, as to a possible injury caused by the spinal surgery. The radiologist compared a March 16, 2017 pre-operative MRI of Mr. Blanc's spine to an October 18, 2018 MRI of the same area and opines that this "earliest post-operative image" demonstrates "post-traumatic high T2 signal" and accumulation of fluid, consistent with an injury to the spinal cord such as a stroke. The radiologist opines that "a stroke is the most likely explanation for the new post-operative neurological deficits that Mr. Blanc claims affect his legs and his bladder," citing his testimony that he needed a wheelchair and could no longer ambulate on crutches after the surgery and that he was prescribed medication for his bladder. The expert opines without detail that there is a causal link between the surgery performed by Dr. Caridi and the manifestation of a stroke which caused Mr. Blanc's subsequent injuries.
Based on the submissions, even considering the affirmations of the improperly redacted experts, Plaintiffs have failed to raise a genuine, triable issue of fact sufficient to defeat Defendants' summary judgment motion. Plaintiffs do not raise any issues of fact or conflicting expert opinions as to the timing, two-part staging, performance, or techniques used by Dr. Caridi in the surgery, and in fact the experts do not assert that any deviations from the standard of surgical care caused injury to the patient. Plaintiffs' surgery expert concedes that there is no evidence of direct damage to the spinal cord, additional compression, or operative trauma. Both experts also concede that a spinal cord stroke and paralysis is a known risk of the surgery, even if performed in accordance with the standard of care. In sum, Plaintiffs' argument in opposition is that the patient's injuries were caused by a surgery which was properly performed but should not have been performed at all, because it was (1) not warranted based on the patient's condition and/or (2) not consented to with proper understanding of the foreseeable risks.
To the first point, which is the essence of Plaintiffs' medical malpractice claim, the opinions of Plaintiffs' surgery expert are conclusory, speculative, and unsupported by the record. As the movants address in their reply, Plaintiffs' expert states repeatedly that the patient was "stable" and therefore a complicated or high-risk surgery was contraindicated, and it should have been deferred until his condition was progressively worsening. Plaintiffs' expert does not address that in the multiple consultations with Dr. Caridi, he documented a progressive loss in muscle [*8]strength, numbness, and "increasing" or "worsening" extremity weakness and bowel and bladder function. The expert relies exclusively on vague excerpts from Plaintiffs' testimony about activities the patient was able to perform, such as traveling abroad, in his years of living with kyphoscoliosis prior to the surgery. However, the patient also testified that his pain and weakness had worsened since he began using crutches in 1990 (Mr. Blanc deposition tr, at 117-118). The expert fails to address or offer a counter-opinion on the patient's existing neurological deficits before surgery, and therefore the argument that he was not yet progressing or worsening is not grounded in the evidence.
Furthermore, the expert never addresses the fact that multiple surgeons in addition to Dr. Caridi (Dr. Quirno, Dr. Passias, and other "high-risk spinal conference" specialists consulted by Dr. Quirno) had deemed the patient was a proper and even necessary candidate for major spinal fusion and kyphoscoliosis correction surgery. Instead, Plaintiffs' expert misrepresents the record by stating that Dr. Passias and Dr. Quirno "refused" to do the procedure due to its "complex nature." This is controverted by the evidence, as both physicians documented that they were prepared to go forward and declined only because of the patient's religious objection to blood transfusion and the risk of blood loss. The patient testified in his own deposition that he was strongly urged by Dr. Passias that he needed the surgery to avoid future pain and paralysis (id., at 107), but Dr. Quirno did not want to perform the procedure unless he agreed to allow blood transfusion (id., at 110-111). This was the same assessment and reasoning documented in Dr. Passias and Dr. Quirno's records at the time (Exhibit G, at 2; Exhibit H, at 3). It is not alleged that any complications from the patient's surgeries were the result of blood loss or the staging or techniques used by Dr. Caridi to minimize the need for transfusion. The expert's opinion that Dr. Caridi undertook a procedure that was unnecessary, premature, or "impossible" is therefore conclusory and unsupported by the record.
Turning to whether proper informed consent was obtained, Plaintiffs' surgery expert fails to raise an issue of fact in response to the movant's prima facie showing that Dr. Caridi disclosed the risks, expected benefits, and alternatives to the surgery prior to the patient signing the hospital's consent forms, nor the movant's showing that the procedure was not a proximate cause of the patient's injuries.
The record is clear that the patient was told by Dr. Caridi and multiple other doctors that the goal of the surgery was to prevent a progressively worsening condition and paralysis, but that it would be highly difficult and carried risks including spinal injury or complications. Plaintiffs' expert attempts to articulate a higher standard of care for explaining the "pros and cons" of surgical intervention, but ultimately does not raise an issue of fact as to the defendant's showing that "the plaintiff signed a detailed consent form after being apprised of alternatives and foreseeable risks" (Pirri-Logan v Pearl, 192 AD3d 1149). This alone establishes the defendant's entitlement to summary judgment as a matter of law. Thus, there are no issues of fact that the medical provider disclosed alternatives and informed the patient of risks prior to his consent to the surgery (Pirri-Logan, at 1149; Figueroa-Burgos, at 811).
The patient also testified that non-party Dr. Quirno, whom he saw for a second opinion, told him repeatedly it was a "difficult case" and would involve multiple surgeries. He testified that Dr. Passias also advised him that it was a "difficult surgery" but unequivocally recommended that it was necessary to avoid future pain or paralysis. He went on to have a lengthy and documented discussion with both about his reluctance to consent to blood transfusion due to his religious beliefs, and according to his testimony, Dr. Quirno told him that [*9]would be highly dangerous for lung complications or death. In their records, Dr. Quirno and Dr. Passias each documented counseling the patient, with Dr. Passias stating "diagnosis, prognosis, treatment options, risks, and alternatives were discussed in detail using language understandable to this particular patient. . . We discussed in detail the risks and benefits associated with the procedure including but not limited to neurological complications, hardware failure, nonunion, infection, medical comorbidities" (Exhibit H). It is clear from the record that Mr. Blanc was informed by multiple doctors about the complex and difficult nature of the surgery, the fact it would take a long time to recover, and the risks it entailed. He considered whether to undergo such a procedure or to defer treatment and monitor the condition for nearly six months.
The Second Department has held that a plaintiff cannot sustain an informed consent claim where the patient was apprised of the risks, even by other physicians, and chose to undergo treatment. In Spano v Bertocci (299 AD2d 335 [2d Dept 2002]), the appellate court considered a claim arising from medication with a side effect of birth defects, where the plaintiff was informed of that risk by two other physicians. The court set aside the verdict on the informed consent claim, holding "Since the mother already knew that there was a danger of birth defects . . . there is simply no valid line of reasoning and permissible inferences which could possibly lead rational fact-finders to conclude that [defendant's] failure to inform her of the dangers of becoming pregnant while taking Depakote was a proximate cause of the injury" (Spano v Bertocci, 299 AD2d 335 [2d Dept 2002]).
Contrary to the statements of Plaintiffs' expert, there is nothing in the record to support that Dr. Caridi urged him to undergo surgery "immediately" or without allowing the option to monitor his progression. It is clear from the submissions and testimony of all parties that the patient consented to the surgery after weighing his options for approximately six months, including multiple follow-up visits and conversations with Dr. Caridi, and seeking a second opinion from two other neurosurgeons. Mr. Blanc testified that Dr. Caridi — as well as the other surgeons he visited — told him that without the procedure he would ultimately become paralyzed and require a wheelchair, which the Plaintiffs' neurosurgery expert does not dispute was a factual assessment of his spinal deformity. There is no issue of fact that the alternative of not getting surgery and taking a "wait and see" approach was explained the patient. He did in fact defer surgery for several months from his first consultation with Dr. Caridi, and he spoke with two other surgeons who he ultimately did not proceed with. It is not disputed by either parties' experts that there was no non-surgical alternative that could have corrected his condition or stopped its progression, only the matter of when or whether he would choose to have the surgery.
Plaintiffs' expert relies heavily on alleged discrepancies in the testimony of Dr. Caridi, Mr. Blanc, and his spouse, Marie Rene Blanc, as to what they were informed the risks and foreseeable outcomes/benefits of the surgery would be. The statements picked from their testimony, however, are simply too vague and equivocal to raise a question of fact as to the substance of Mr. Blanc's conversations with Dr. Caridi. The fact Mr. Blanc only recalls one specific risk that was discussed — a chance of bone loss — does not disprove or contradict Dr. Caridi's testimony that they had a more thorough conversation of surgical risks on August 30, December 14, and March 1, prior to the consent form signed by Mr. Blanc at the hospital.
Further, there is no evidentiary support, even from Mr. Blanc's deposition testimony, that he was promised or guaranteed that he would improve his ability to walk and would no longer need crutches. The Court agrees with Defendants' argument that the record supports a conclusion that Dr. Caridi disclosed that the procedure would be complex and carried serious risks — [*10]including paralysis, infection, or death — that could make his pain or mobility worse in the short or long term. Plaintiffs' claim that the patient was misinformed about the purpose or benefit of the surgery is not adequately supported by Mr. Blanc's testimony that he was told "the goal" was to improve function and avoid requiring a wheelchair in the future.
Furthermore, on the issue of proximate causation — a necessary element of both the medical malpractice and informed consent claims — Plaintiffs fail to raise an issue of fact sufficient to defeat summary judgment. The only injury asserted by Plaintiffs as a result of the surgery is the possibility of a post-operative stroke, which Plaintiff's expert concedes is a known risk of the procedure and occurs in the absence of malpractice. Additionally, the moving defendants correctly note this is a theory raised for the first time in opposition and was never addressed in Plaintiffs' bill of particulars or at the deposition stage (see Townsend v Vaisman, 203 AD3d 1199, 1203 [2d Dept 2022] ["a plaintiff cannot defeat a summary judgment motion that made out a prima facie case by merely asserting, without more, a new theory of liability for the first time in opposition papers"]). Additionally, this theory as presented by both Plaintiffs' experts is equivocal and speculative, based only on their interpretation of a single MRI months after the surgeries, which they opine shows high fluid signal intensity and focal injury "such as can be caused by a stroke." The defendants note in their reply that this is incorrectly referred to as the "earliest post-operative image" and the expert does not address any of the other available post-operative radiological films or reports. This is followed by general and conclusory allegations that strokes are one potential risk of spinal surgery. The opinions of the neurosurgery expert as to his post-operative complaints and course of recovery are not grounded in the evidence, and they do not address the specific opinions and assertions set forth by the movants' expert.
Thus, even if Dr. Caridi's disclosure of risks and benefits was not established herein, Plaintiffs have failed to raise an issue of fact that the alleged unconsented-to surgery was a proximate cause of the patient's claimed injuries. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept. 2022], citing Russell v. Garafalo, 189 AD3d 1100, 1102, [2d Dept. 2020]). However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" and "expert opinions in opposition should address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Longhi v Lewit, 187 AD3d 873 [2d Dept 2020] [internal citations omitted]). For the reasons discussed, the Court finds the opinions of Plaintiffs' experts are conclusory, speculative, and unsupported by the record, and therefore do not raise an issue of fact precluding summary judgment on the medical malpractice or informed consent claims.
Plaintiffs do not oppose the branch of the motion seeking to dismiss the causes of action for negligent hiring and retention. As Mr. Blanc's underlying causes of action sounding in medical malpractice are dismissed, the derivative claims of Marie Rene Blanc for loss of consortium cannot survive independently and are also dismissed (see Klein v Metropolitan Child Services, Inc., 100 AD3d 708, 711 [2d Dept 2012]).
Accordingly, it is hereby:
ORDERED that Defendants' motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them, is GRANTED, and this action is DISMISSED in its entirety.
The Clerk shall enter judgment in favor of JOHN CARIDI, M.D. and MOUNT SINAI HOSPITAL.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.